Case Number 14-2651

---

**United States Court of Appeals
for the Eighth Circuit**
_____

United States of America                                    Appellant

vs.

Kenneth Vaughn Knight                                        Appellee
_____

On Appeal from the United States District Court
for the Western District of Arkansas, Honorable P. K. Holmes
_____

**APPELLEE'S BRIEF**

_____

David R. Matthews
Arkansas Bar No. 76072
Kimberly R. Weber
Arkansas Bar No. 94207
Sarah L. Waddoups
Arkansas Bar No. 2004103
MATTHEWS, CAMPBELL, RHOADS,
McCLURE & THOMPSON, P.A.
119 South Second Street
Rogers, Arkansas 72756-4525
(479) 636-0875   (479) 636-8150-Fax
drm@mcrmt.com
krw@mcrmt.com
slw@mcrmt.com

## SUMMARY OF THE CASE

This appeal arises from the District Court's granting a new trial on seven charges and an acquittal on the eighth. Chief Judge P.K. Holmes, III, a former United States Attorney, presided over this trial. Throughout the proceedings and in rendering its post-trial decision, the District Court was thoughtful and meticulous. Contrary to Appellant's assertions, the District Court found the Government's evidence to be "thin," "underwhelming," "not conclusive" and "not sufficient" to support the guilty verdicts. (*See e.g.,* DCD 208 pgs 33, 35, 41, 60, 72, 796, 84, 88, 91, 93). Repeatedly, the District Court found "no evidence" to support various elements of the offenses charged. (*See e.g.,* DCD 208 pgs 68, 69, 79, 85, 88). There was no abuse of discretion in granting the new trial and the decision should be affirmed. Similarly, a *de novo* review of the acquittal on Count 3 should also be affirmed, as it was consistent with the evidence.

Appellee agrees that the nature of this case as well as the lengthy District Court opinion warrant oral arguments. Appellee, however, requests that this Court grant 30 minutes of oral argument because of the fact-intensive nature of this case.

i

# TABLE OF CONTENTS

Summary of the Case ................................................................. i

Table of Contents ..................................................................... ii

Table of Authorities .................................................................. v

Statement of the Issues ............................................................ 1

Statement of the Case ............................................................... 2

I. Procedural History ................................................................ 2

II. Statement of Facts .............................................................. 3

    A. For more than a year, Knight represented Barber
    on a wide variety of matters ................................................. 3

    B. Knight used his IOLTA trust account to assist Barber
    in paying creditors, in remaining solvent and avoiding
    bankruptcy. ......................................................................... 6

    C. The three real estate deals were attempts by Barber to pay
    creditors, remain solvent and avoid bankruptcy ................. 8

        1. The Ballpark Deal ................................................. 9

        2. The Spring Creek Deal ......................................... 15

        3. The Executive Plaza Deal ..................................... 17

    D. Knight did not make any deliberate misstatements on
    Barber's bankruptcy filings. ................................................ 18

        1. The purpose of the supposed meeting with
        Christy Bennett was to discuss tax issues ........... 18

        2. Barber repeatedly lied to Knight during the
        preparation of the bankruptcy filings .................. 19

Appellate Case: 14-2651     Page: 3     Date Filed: 01/21/2015 Entry ID: 4236142

E. Funds were properly received and disbursed by Knight via his IOLTA account.......................................................24

    1.    Funds Knight received as Barber's attorney........24

    2.    Funds Knight received while acting as escrow agent ......................................................28

Summary of Argument .......................................................31

Argument ..........................................................................37

I.    There was no abuse of discretion in granting a new Trial, and the District Court's Order should be affirmed ....37

    A.    Standard of Review on Grant of New Trial on Counts 1, 2 and 4-8 ............................................37

    B.    Argument .............................................................39

    1.  A new trial was appropriate on Count 1: Conspiracy to Commit Bankruptcy Fraud ......39

    2.  A new trial was proper on Count 2 because Knight did not commit Bankruptcy Fraud......45

    (a) None of Knight's actions were in contemplation of bankruptcy and therefore cannot constitute bankruptcy fraud. ....................................................46

    (b) Knight did not commit bankruptcy fraud ...................................................54

    3.  A new trial was proper on Counts 4-8 because the evidence of Money Laundering preponderated against the verdict...................56

iii

4. The speed of the jury's guilty verdict strongly suggests that the interests of justice require a new trial. ....................................................57

II. Knight was correctly acquitted on Count 3: Making False Statements under 18 U.S.C. § 152(3) ................................60

1. Standard of Review............................................60

2. Argument...........................................................61

III. The conditional new trial on Count 3: Making False Statements was proper ......................................66

1. Standard of Review............................................66

2. Argument...........................................................67

IV. Conclusion .............................................................69

Certificate of Compliance ....................................................71

Certificate of Service .............................................................72

Appellate Case: 14-2651    Page: 5    Date Filed: 01/21/2015 Entry ID: 4236142

# TABLE OF AUTHORITIES

**Case Law:**

*Fireman's Fund Ins. Co. v. Aalco Wrecking Co.,*

　　466 F. 2d 179 (8th Cir. 1972)............................................................58

*Hiser v. XTO Energy, Inc.,* 768 F.3d 773 (8th Cir. 2014) ...........................38

*In re Addison,* 540 F.3d 805 (8th Cir. 2008)................................................44

*McGee v. South Pemiscot School Dist.,* 712 F.2d 339 (8th Cir.1983)..........58

*Milavetz v. United States,* 559 U.S. 229 (2010).................................1, 47, 48

*Snyder v. United States*, 448 F.2d 716 (8th Cir. 1971) ................1, 62, 65, 66

*Townsend v. Bayer Corp.,* No. 13-1468, 2014 WL 7172031

　　(8th Cir. Dec. 17, 2014) ............................................................33, 36

*United States v. Calhoun*, 721 F.3d 596 (8th Cir. 2013)..............................40

*United States v. Campos*, 306 F.3d 577 (8th Cir. 2002)..........................1, 37

*United States v. Clark,* 668 F.3d 568 (8th Cir.2012) ...................................60

*United States v. Edgar*, 971 F. 2d 89 (8th Cir. 1992)...................................42

*United States v. Feola*, 420 U.S. 671 (1975) ...............................................40

*United States v. Foster*, 740 F.3d 1202 (8th Cir. 2014) ..............1, 36, 39, 61

*United States v. Haye*s, 574 F.3d 460 (8th Cir. 2009)..................................62

*United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005) ...............................57

Appellate Case: 14-2651　　Page: 6　　Date Filed: 01/21/2015 Entry ID: 4236142

*United States v. Huerta-Orozco*, 272 F.3d 561 (8th Cir. 2001).... 1, 37, 38, 66

*United States v. Knight,* 25 F. Supp. 3d 1104

    (W.D. Ark. June 10, 2014))................................................................2

*United States v. Mitchell*, 388 F.3d 1139 (8th Cir. 2004) ............................62

*United States v. Pizano*, 421 F.3d 707 (8th Cir. 2005) ................................56

*United States v. Reddest*, 512 F.3d 1067 (8th Cir. 2008) ............................61

*United States v. Weaver*, 554 F.3d 718 (8th Cir. 2009) ............................1, 69

*United States v. West*, 22 F.3d 586 (5th Cir. 1994)....................................49

*United States v. Yielding*, 657 F.3d 688 (8th Cir. 2011) ............................48

*White v. Pence*, 961 F.2d 776 (8th Cir. 1992).......................................37, 57

**Statutes and Rules:**

11 U.S.C. § 526 ........................................................................48

18 U.S.C. § 152 .......................................................... 31, 46, 47, 51, 60,

18 U.S.C. § 157 ........................................................................31

18 U.S.C. § 371 ........................................................................31

18 U.S.C. § 1957........................................................................3, 56

Fed. R. Crim. P. 29 .......................................................................67

Fed. R. Cr. P. 33(a) ......................................................................37

Fed. R. Bankruptcy P. 1008 ........................................................62

Fed. R. Bankruptcy P. 9011 .......................................................62, 64

vi

Appellate Case: 14-2651     Page: 7     Date Filed: 01/21/2015 Entry ID: 4236142

Fed. Crim. Jury Instr. 7th Cir. 18 U.S.C. §152(7) Definition of

"In Contemplation of Bankruptcy Proceeding" (2012 ed.) ................48

Appellate Case: 14-2651    Page: 8    Date Filed: 01/21/2015 Entry ID: 4236142

# STATEMENT OF THE ISSUES

1. The District Court properly granted a new trial on Counts 1, 2 and 4-8 which alleged that Knight conspired to commit bankruptcy fraud, committed bankruptcy fraud and laundered money based solely upon deposits to his IOLTA account which were not made in anticipation of bankruptcy and which were dispersed to Barber and various creditors more than six months before Barber filed bankruptcy.

- *Milavetz v. United States,* 559 U.S. 229 (2010)
- *United States v. Campos*, 306 F.3d 577 (8th Cir. 2002)
- *United States v. Huerta-Orozco*, 272 F.3d 561 (8th Cir. 2001)

2. Knight was properly acquitted of Count 3:  Making False Statements because the evidence was insufficient to establish that he aided and abetted Barber's Statement of Financial Affairs.

- *United States v. Foster*, 740 F.3d 1202 (8th Cir. 2014)
- *Snyder v. United States*, 448 F.2d 716 (8th Cir. 1971)

3. The District Court correctly granted a conditional new trial on Count 3 because there was insufficient evidence to support the jury verdict and the jury instructions themselves warranted a new trial.

- *United States v. Weaver*, 554 F.3d 718 (8th Cir. 2009)
- *United States v. Huerta-Orozco*, 272 F.3d 561 (8th Cir. 2001)

1

## STATEMENT OF THE CASE

Appellant's statement of the case attempts to paint a damning picture, but it is materially inaccurate and incomplete. In order to interconnect Appellant's prejudicial Statement of the Case, Knight follows the same order and will incorporate or reference Appellant's Brief ("AB").

### I.  PROCEDURAL HISTORY

Although correct regarding the charges and the trial, the Appellant materially misconstrues Chief Judge Holmes' June 2014 Opinion and Order on the post-verdict motion. (AB 3-4, DCD 208 *also available* at *United States v. Knight,* 25 F. Supp. 3d 1104 (W.D. Ark. June 10, 2014)). The District Court repeatedly stated that the Government's evidence against Knight was "not conclusive," "not compelling," "not sufficient" and even found that there was "no evidence" on various elements of the offenses. (DCD 208 pgs 33, 60, 68, 39, 54, 55, 71, 72, 76, 79, 84, 76, 91, 93). Yet, Appellant skews the Opinion to imply that the evidence was legally sufficient on *all* counts. (AB 4 and 29). The Opinion itself is very clear:

2

"The Court finds that, despite the abstract sufficiency of the evidence, the circumstantial evidence in this case as to Counts 1, 2, and 4-8 was not so convincing as to dispel the Court's fears that a miscarriage of justice may have occurred. Rather the Government's evidence largely invited only speculation and conjecture." (DCD 208 pg 100).

The District Court reached this conclusion after an "exhaustive review of the record" in this case. (DCD 208 pg 1).

## II. STATEMENT OF FACTS

Appellant's Statement of Facts contains numerous prejudicial errors. Numerous relevant facts are omitted. Numerous "facts" are taken out of context. And there are numerous instances where Appellant asserts as "fact" a subject for which there was contradictory evidence at trial.

### A. FOR MORE THAN A YEAR, KNIGHT REPRESENTED BARBER ON A WIDE VARIETY OF MATTERS.

In January of 2008, Knight learned that a casual acquaintance, Brandon Barber, was experiencing financial difficulties, and the two had a casual meeting for which no attorney fees were charged. (Tr. Day 8 pg 1456-57). The Government asserts that Knight was hired "initially for

3

advice on 'what [Barber's] options were for bankruptcy.'" (AB 6). This assertion, however, is a blatant misinterpretation of the evidence at trial. The transcript, as cited by the Government, contains the following inquiry between its counsel and Witness John Bracey:

> "Q.    And what did [Knight] work with Brandon [Barber] on during that time? [referencing early 2008]
>
> A.    Exactly what -- at first my understanding was he was coming on in a role to advise Brandon on what his options were for bankruptcy, but firsthand, I did not know specifically that, but I assumed that that's what it was.
>
> Q.    Now, when you say advise him about his options for bankruptcy, do you mean personal bankruptcy or business bankruptcy or both?
>
> A.     I assumed both, but I don't know." (Tr. Day 3 pg 498).

Although the witness repeatedly acknowledges that he "doesn't know" the purpose of Knight's legal representation, the Government asserts as fact that it was "for [Barber's] bankruptcy." (AB 6).

In actual fact, multiple witnesses testified that Knight served as Barber's "general counsel" and "worked with him pretty much on everything" beginning in early 2008. (Tr. Day 1 pg 39, Tr. Day 2 pg 112,

4

Tr. Day 3 pgs 416-17, 498, 501). Knight himself testified that he worked on so many different projects for Barber that they agreed upon a set monthly fee, rather than hourly billing. (Tr. Day 8 pgs 1461-62). In total, Knight represented Barber for 18 months before bankruptcy was filed. During this time, Knight and Barber exchanged thousands of emails which were later scrutinized and provided much of the Government's evidence against Knight. (DCD 182). These emails are candid, but there is no email in which "filing bankruptcy" is discussed between Knight and Barber.

The evidence in the record overwhelmingly establishes that Barber did not want to file bankruptcy. Various government witnesses testified that Barber wanted to "rework his debt," "did not want to file bankruptcy," and intended to "get out of this [financial] mess." (Tr. Day 3 pgs 510, 517-18, Tr. Day 2 pg 184). Government witnesses confirmed that throughout 2008 and well into 2009, Barber "had no intention of filing bankruptcy." (Tr. Day 6 pgs 1118-19, Tr. Day 2 pg 184)

Knight and IRS Special Agent David Kimbrough testified that Barber did not decide to file bankruptcy until the same week it was filed. (Tr. Day 8 pg 1498, Tr. Day 7 pgs 950, 952). When Barber did decide to file bankruptcy in July 2009, Knight required Barber to sign a new

5

employment agreement because bankruptcy was not part of his legal representation of Barber to that point. (DX 148, Tr. Day 8 pgs 1498-99).

Finally, the Government's expert witness, Jill Jacoway testified that it was "not uncommon" for clients in what she deemed a "hopeless situation" to avoid bankruptcy and acknowledged that over half of the clients she counseled never filed. (Tr. Day 9 pgs 1669-70).

As will be discussed in greater detail in the Argument portion of this Brief, precisely when Barber and Knight acted "in contemplation of bankruptcy" is crucial to this case.[1] The preponderance of the evidence clearly indicates that Barber had no intention of filing bankruptcy and was doing all he could to avoid it. The Appellant improperly relies upon second-hand assumptions and an incorrect interpretation of law to artificially satisfy the "contemplation of bankruptcy" element of the crimes charged.

## B.  KNIGHT USED HIS IOLTA ACCOUNT TO ASSIST BARBER IN PAYING CREDITORS, REMAINING SOLVENT AND AVOIDING BANKRUPTCY.

Knight openly acknowledged that he deposited money into his Interest on Lawyers Trust Account ("IOLTA") on behalf of Barber. (Tr.

---

[1] *See* pages 46-53.

6

Day 8 pg 1470). The evidence showed seven deposits between April and October of 2008, the last of which was at least 9 months before Barber filed bankruptcy. (*Id.*). The first deposit occurred in April 2008 when Barber asked Knight to deposit several cashier's checks from the forced closure of accounts at First State Bank. (Tr. Day 8 pg 1470, Tr. Day 4 pgs 619-620, GX 118). Barber claimed he had no bank accounts and did not have time to set up another account because he was late for a flight to New York to participate in National Autism Day in support of his autistic son. (Tr. Day 8 pg 1470-71). Knight did not know that Barber had other accounts until sometime later. (Tr. Day 8 pg 1476). That same day, Knight received $688,937.00 in escrow in connection with a real estate transaction called the Ballpark deal.[2] (GX 118).

Going forward, Barber continued to request that Knight deposit monies into his trust account. A summary of all of the deposits and withdrawals from Knight's trust account is set out below[3] and in the District Court's Opinion and Order. (DCD 208 pgs 8-22). Beginning in January 2009—six months before Barber filed bankruptcy—Knight's trust account did not contain any Barber funds. (DCD 208 pg 38, GX

---

[2] The Ballpark deal is discussed in detail at pages 9-15.
[3] *See* pages 24-30.

7

118, Tr. Day 6 pg 1120). All of the money had been disbursed, per Barber's instructions, to creditors, business partners or Barber himself.

While these deposits were perhaps atypical, they were not fraudulent. In fact, a number of the payments out of the trust account satisfied Barber's debts and obligations. Monies from the trust account were used to pay Barber Group employees, pay premiums on dental insurance and cover general operating expenses. (Tr. Day 4 pg 620, 622, GX 118, DX 65). Furthermore, multiple creditors were paid via these funds. For example, ANB Financial, Bank of Fayetteville and First Federal Bank each received interest payments on existing loans via payments from Knight's trust account. (GX118, Apr. 7, 2008 and Apr. 11, 2008). And judgment creditors and a lienholder were also paid via Knight's trust account. (DX 58, GX 118).

### C. THE THREE REAL ESTATE DEALS WERE ATTEMPTS BY BARBER TO PAY CREDITORS, REMAIN SOLVENT AND AVOID BANKRUPTCY.

Of the three real estate deals discussed heavily at trial, two—the Ballpark and Spring Creek deals—involved real estate being purchased and then re-sold on the same day for a greater price. While Appellant construes these transactions as "flip" deals involving a "shell company" acting as a "straw man" to sell at an "inflated price," it is important to

8

note that there is nothing illegal about these transactions. (AB 9); (Tr. Day 3 pg 484) (Government witness Donna Stewart acknowledging the transaction's legality). Between sophisticated commercial real estate developers, it was entirely lawful for different individuals to have been willing to sell and buy real estate at widely different prices. Likewise, Knight's awareness of both the buyers and the sellers in these transactions does not make his limited participation illegal.

### 1. THE BALLPARK DEAL

At its core, this deal revolves around Barber's finding a seller for the Ballpark property for the price of $2.0 million, and a buyer willing to purchase the same property for $3.2 million. (Tr. Day 2 pgs 120-21, GX 4b). The difference—$1.2 million—was available profit, a portion of which Barber hoped to leverage out of the transaction to either reduce his debt or generate revenue to operate his business interests. (*Id.*). The lending bank was fully aware of Barber's involvement in the transaction. (DX 132, DCD 208, pg 61).

The additional parties in this deal added an additional layer of complication. Bob Gaddy, through Outfield Development, LLC ("Outfield"), agreed to help Barber by taking out the $3.2 million loan to finance the final purchase price. In return, Outfield received over

9

$435,000 in cash (which was disclosed on the HUD-1), a personal guaranty from Barber for $470,000, and similar guarantees from Van Doren and his business partner for $350,000 each. (DX 133, GX 4b). Barber directed Ken Hall, an attorney not connected to Knight, to form an entity called EIA International, LLC ("EIA") with Barber as the sole member. (Tr. Day 3 pg. 346).

Barber asked Van Doren to become involved in the deal to give First Federal Bank an additional compelling reason to lend the $3.2 million to Outfield. Van Doren—through his investment company Epsilon Investments, LLC ("Epsilon") agreed to assume a $514,000 First Federal Bank loan on which Barber's wife had defaulted. (Tr. Day 2 pg 122). Exchanging Barber for Van Doren would add a much more credit-worthy borrower to First Federal Bank's loan portfolio. In exchange, Barber agreed to help Van Doren liquidate several homes in the Timber Trails subdivision which had caused Van Doren "$600,000 in loans and $65,000 in losses." (*Id.*).

The principle lawyer for the Ballpark deal was Ken Hall, not Knight. (Tr. Day 3 pgs 504-05) (Witness Bracey testified that Hall was the "keeper of the keys" on the Ballpark transaction.). According to Hall, he began work on the Ballpark deal in the "[m]iddle part of February

10

2008" and "drafted contracts," "reviewed contracts," "reviewed title work," and "[c]ommunicated with [Barber] and communicated with several other parties about the transaction." (Tr. Day 3 pg 345). Hall was intimately involved in the negotiation and drafting of three "variations" of the escrow agreement between EIA and Epsilon. (Tr. Day 3 pg 351-52). It was Hall, not Knight, who reviewed and approved the HUD-1 form prepared by Donna Stewart. (DXs 130, 133). Hall worked on the deal generally and the escrow agreement specifically until "a couple days before the closing." (Tr. Day 3 pg 352). Through his intimate knowledge of the Ballpark deal, Hall became concerned with inconsistencies, including misunderstandings and disagreements between Van Doren and Barber about the purpose and use of the escrow agreement. (*Id.* at 362-64). Subsequently, Hall refused to serve as the escrow agent for the $688,000 that was to be held in escrow. (*Id.* at 362-64).

Sometime prior to the actual Ballpark transaction, Knight, at Barber's request, had drafted a real estate purchase agreement between two parties who were not ultimately the Buyer or Seller related to the

11

land involved in the Ballpark transaction.[4]  It was not until Hall refused to be the escrow agent that Knight became involved in the Ballpark transaction.  (Tr. Day 8 pg 1473-74).  Literally the night before the closing of the transaction, Knight edited the existing escrow agreement Hall had drafted to incorporate handwritten changes Van Doren and Barber requested.  (Tr. Day 8 pgs 1473-74, Tr. Day 3 pgs 364, 382).  Though Hall's concerns were strong enough that he would decline fee-generating work on the deal, he never shared a word of his misgivings with Knight.  (*Id.* at 374-76).  When Barber asked Knight to act as escrow agent, Knight relied in large part on the reputation of Hall's firm.  (Tr. Day 8 pg 1474-75).  In sum, Knight made stenographic changes to the escrow agreement and acted as escrow agent in reliance on documents drafted by Hall.

For arranging the transaction, Barber's entity, EIA, was paid over $77,000 at closing and Barber's wife was relieved of over $514,000 in debt to First Federal Bank.  Barber also agreed that EIA would be liable to Van Doren's entity Epsilon for the sale of the Timber Trails homes.

---

[4] Knight drafted a purchase contract between a seller named Riggins and Epsilon.  (Tr. Day 8 pg 1472).  Ultimately, the property changed hands—unrelated to Barber—and this contract was abandoned and is not related to the actual Ballpark Deal.

Appellate Case: 14-2651    Page: 20    Date Filed: 01/21/2015 Entry ID: 4236142

Epsilon and EIA entered into an escrow agreement for approximately $688,000, the value of the Timber Trails homes. (GX 12, DX 133). The escrow agreement stated that, as EIA managed to liquidate the Timber Trails homes, Epsilon would agree that commensurate funds could be released from escrow to EIA. (*Id.*).

The actual ownership of the $688,000 escrowed funds was hotly disputed at trial. The government relies on a single document created by Knight's secretary after the Ballpark transaction closed as proof that the funds were Barber's individual property. (GX 108; Tr. Day 8 pg 1536). However, the escrow agreement controlling the funds clearly shows that the funds were escrowed by EIA for the benefit of Epsilon for the purpose of fulfilling EIA's existing obligation to Epsilon for the Timber Trails homes. (GX 12). In Knight's handling of the funds, he sought Van Doren's permission on behalf of Epsilon before disbursing the escrow funds to EIA. (GX 19) (seeking Van Doren's permission to transfer $100,000) (*see also* DX 31, DX 33, DX 39, DX 40, DX 53, DX 67). Email communication among Hall, Barber and Van Doren indicates that EIA owned the funds but they were escrowed for Epsilon's benefit. (DX 16, DX 128, DX 184). In sum, the vast majority of evidence at trial

13

showed that EIA owned the $688,000, but received these funds only after obtaining permission from Van Doren on behalf of Epsilon.

The Government's Statement of Facts suffers from a number of additional inaccuracies. There was no "misrepresentation to First Federal Bank about the land's true cost." (AB 10). It cites to statements by FBI Agent Steve Williams regarding entries on Barber's bankruptcy Statement of Financial Affairs, which has no bearing on First Federal Bank's knowledge of the property's cost. (AB 22). Rather, First Federal Bank's own loan decision memo accurately states an appraisal value of $2.7 million and that cash was generated by the transaction. (DX 132). Even Agent Williams admitted that First Federal Bank's decision memo matched the property's appraised value, and that First Federal Bank never complained about being misled during his interview of their officers. (Tr. Day 6 pgs 1097-98, 1101).

Also, the Government states that Gaddy received a "kickback" from the Ballpark deal, relying on testimony of Stacy McSpadden, one of Barber's real estate agents. (AB 10). In so doing, the Government ignores that the alleged "kickback" was clearly listed on the HUD-1. (GX 4b). Furthermore, McSpadden acknowledged that she never handled the actual flow of money in real estate transactions. (Tr. Day 3

14

pg 427). Appellant also ignores, again, that the First Federal Bank loan decision memo plainly states, "Part of the cash that is generated in the overall closing process will be used by Mr. Gaddy as an interest reserve equal to one year of interest carry on this note, deposited with FFB." (DX 132). Calling funds Mr. Gaddy received from the Ballpark deal a "kickback" is facially false. Everyone involved with the transaction was aware of the funds Mr. Gaddy received from the transaction.

## 2. SPRING CREEK DEAL

The Spring Creek deal was another real estate transaction in which Barber arranged to purchase property in the name of EIA then resell the same property to another Bob Gaddy entity, Spring Creek Holdings, LLC ("SCH"). Barber arranged with Jeff Whorton, the property's owner, to purchase the property for $1.2 million through EIA, and then arranged for EIA to sell the property to SCH for $2.1 million. (Tr. Day 3 pg 464, GX 31, GX 34a). Whorton was unaware of the second sale and "sold [the property] for what [he] thought it was worth." (Tr. Day 4 pg 772).

That second sale, the one from EIA to SCH, generated approximately $892,000 in proceeds, of which Barber received over $390,000 from Bob Gaddy. (Tr. Day 3 pg 467). The settlement documents reflect that Barber received the $390,000 as "loan proceeds."

15

(GX 34b). A promissory note between Gaddy and Barber states that the same $390,000 was a loan to Barber, payable with an interest rate of "New York prime plus 1%" per annum." (GX 115).

Appellant relies on the fact that Knight was emailed the settlement documents the evening before the closing as proof that Knight was intimately knowledgeable of the deal. (AB 14, GX 31, 32). However, as the District Court noted, Agent Kimbrough testified that he did not find any evidence to suggest that Knight prepared any of the contracts in the Spring Creek transaction. (DCD 208 pg 68). Furthermore, there was no evidence that Knight knew the details of the transaction or disposition of the proceeds.

As described in detail below, Barber made multiple deposits and transfers between various accounts with the proceeds of the Spring Creek transaction. (*See pages* 15-16 *infra).* None of these transfers involved Knight. Only on August 13, 2008, months after the Spring Creek deal, did Barber transfer $191,000 to Knight. (GX 88, 113). In light of this flurry of transfers, Knight testified that he "had no idea where [the $191,000] came from." (Tr. Day 8 pg 1568).

16

### 3. THE EXECUTIVE PLAZA DEAL

The Executive Plaza deal grew out Barber's attempts to convince Whorton to buy Barber's personal residence. (Tr. Day 4 pg 772-73). Whorton eventually agreed on condition that Barber find a buyer for Whorton's personal residence, for the Executive Plaza commercial lots, and to arrange financing for the deal. (*Id.* at 773). Barber found two buyers for the Executive Plaza lots. (*Id.* at 775).

Barber originally asked for a $400,000 commission for arranging the deal, which Whorton reduced to $394,000 after disagreeing over a miscellaneous $6,000 bill. (*Id.* at 775-76). Whorton wrote a $394,000 check to NWARE Investments, LLC ("NWARE") a new entity created by Knight for Barber, but that check was never cashed. (*Id.* at 779). Instead, Barber returned to Whorton several weeks later and asked for a new check made payable to Knight. (Tr. Day 4 pg 780). This gave Whorton the opportunity to renegotiate the amount with Barber, and the two eventually agreed on $314,000. (*Id.*) The $314,000 was wired to Knight's IOLTA account shortly thereafter. (GX 46, 47). For reasons known only to Barber, he told Knight that Whorton had reneged on his promise to pay a commission, but that Barber planned to borrow $325,000 from Whorton. (Tr. Day 8 pgs 1478-79).

17

While it is clear now that the $314,000 was a payment to Barber, at the time, Barber was "blatantly lying" to Knight about the nature of the funds. (Tr. Day 4 pg 776, Tr. Day 8 pg 1483). Barber told Knight that the $314,000 was a loan from Whorton.[5] (*Id.* at 1479). A contemporaneous email between Knight and Barber confirms that Knight believed that Barber was anticipating a $325,000 loan from Whorton. (Tr. Day 8 pg 1479, DX 82).

For each of these deals Barber was attempting to remain financially solvent—however unconventional these attempts might have been. Knight was only marginally involved in any of these transactions and had no part in any fraud Barber may have committed.

### D. KNIGHT DID NOT MAKE ANY DELIBERATE MISSTATEMENTS ON BARBER'S BANKRUPTCY FILINGS.

#### 1. THE PURPOSE OF THE SUPPOSED MEETING WITH CHRISTY BENNETT WAS TAX PREPARATION.

Government witness Christy Bennett was responsible for recording Barber's various financial dealings to transmit to Vera Crider, Barber's accountant. On July 13, 2009, Bennett emailed Barber regarding the Ballpark and Spring Creek transactions so they could be properly

---

[5] *See* pages 25-26.

18

recorded for tax purposes. (GX 5). She later suggested a meeting with Barber and Knight so she could understand the tax ramifications of the transactions. (*Id*.). Though she could not remember the date or time, Bennett recalled that the tax-preparation meeting took place sometime in the days after July 14. (Tr. Day 4 pg 711). Knight testified that he did not believe a meeting with Bennett ever occurred. (Tr. Day 8 pgs 1555-56). The salient point, however, is that if such a meeting took place it was for help with tax issues, not what income was or was not to be reported on bankruptcy documents. Indeed, at that point Barber had not decided to seek bankruptcy according to his statements to Agent Kimbrough. (Tr. Day 7 pgs 950, 952).

### 2. BARBER REPEATEDLY LIED TO KNIGHT DURING THE PREPARATION OF THE BANKRUPTCY FILINGS.

On July 31, 2009, Barber filed for personal bankruptcy. (GX 55). He made the decision to file only the week before, adamantly maintaining before then his ability to negotiate and make real estate deals to work his way out of his debts. (*See pgs* 51-53). By this time, Barber owed Knight and two associate attorneys at the Knight Law Firm significant legal fees and had not paid anything for months. (Tr. Day 8 pg 1498). Knight agreed to represent Barber in bankruptcy and wipe out

19

Barber's existing legal fees in exchange for a flat fee of $20,000. (DX 148).

Barber's initial filing was a standard "skeleton petition" that would be heavily supplemented in the following months. (Tr. Day 7 pgs 1427-28). During that process, Knight and his associate attorneys asked Barber to give full, complete, and honest answers about his financial situation. (DX 106). Knight directly told Barber, "[W]e need to discuss your income and make sure we are comfortable with how we have it listed. I would rather have too much on their [sic] instead of not enough." (DX 110). Agent Kimbrough testified that Barber said Knight told him to "report everything," but that Barber had not done so. (Tr. Day 7 pg 953).

Barber's accounting of his debts and income was scattered and difficult to follow. (*See, e.g.,* DX 166). Knight and his associates worked primarily with Bennett in gathering information needed for Barber's bankruptcy filing. (DCD 208 pg 24; Tr. Day 8 pg 1502). But, Barber instructed Bennett to continue to lie to Knight. In response to a request by John Terry Lee, the bankruptcy trustee in Barber's bankruptcy case, Knight asked Barber for the three most recent bank statements for NWARE. (DX 96). Barber, however, instructed Bennett to deliberately

Appellate Case: 14-2651    Page: 28    Date Filed: 01/21/2015 Entry ID: 4236142

exclude the "latest" bank statement because he "[didn't] want to show the cashier's checks etc" to Knight and the bankruptcy court. (*Id.*). Bennett complied. (*Id.*). Knight, in honest reliance on the information provided by his client, did not give Lee the most recent bank statements as requested. (Tr. Day 8 pgs 1507-09). Lee ultimately was not satisfied with the supplemental responses Knight submitted in support of Barber's verified bankruptcy petition. (*See*, Tr. Day 3 pgs 554-55).

One of Barber's primary creditors, Legacy Bank, filed an adversary proceeding objecting to Barber's bankruptcy discharge. (GX 55f; Tr. Day 2 pgs 190, 200). Knight did not initially represent Barber in the adversary proceeding; however, Knight agreed to represent Barber pro bono in the adversarial proceeding when he found out how poorly Legacy Bank's attorney "had been treating [Barber] as a pro se litigant." (DX 148; Tr. Day 8 pgs 1499-1500, 1509-10). In an effort to catch up on the proceedings and work through the difficult legal questions in classifying various money transfers, Knight enlisted the advice of University of Arkansas law professor Tim Tarvin. (*Id.* at 1511).

The depositions and trial in the adversarial proceeding revealed a host of Barber's concealments from and lies to Knight. Van Doren testified about a $64,000 check and $30,000 in cash Barber asked Van

Appellate Case: 14-2651    Page: 29    Date Filed: 01/21/2015 Entry ID: 4236142

Doren to hold for him. (Tr. Day 2 pg 156-58). Knight first learned about both on Sunday, August 15, 2010, four days before the adversarial proceeding hearing began. (DX 201). In email with Tarvin, Knight tells Tarvin of his recent discovery and seeks advice for how to handle them for both the adversarial proceeding and the bankruptcy filings. (*Id.*). While Tarvin advised Knight to amend the SOFA, Knight ultimately decided not to do so because neither the $64,000 nor the $30,000 cash was an absolute transfer that required disclosure on the SOFA. (Tr. Day 8 pg 1515). For his part, Barber's explanation to Knight was that he "completely forgot about that check to be honest." (DX 105). Barber also lied and claimed that he only gave the money to Van Doren because he did not have a checking account at the time. (*Id.*).

During the adversarial proceeding, Knight learned that Barber actually did have bank accounts when he asked Knight to accept some of the deposits. (Tr. Day 8 pg 1522). When questioned by Legacy Bank's attorney on the first day of the adversarial proceeding trial, Barber attempted to repeat his lies that he only gave it to Van Doren because he did not have a bank account. (*Id.*, DX 177). Legacy Bank's attorney "then walked [Barber] through about three or four accounts that were open in his name." (*Id.*, DX 177). In an email to his associate attorney

Appellate Case: 14-2651    Page: 30    Date Filed: 01/21/2015 Entry ID: 4236142

later that evening, Knight then said, "[Barber] told us a long time ago those accounts were closed." (*Id.*). In sum, Barber's constant lies to Knight prevented Knight from forming an accurate picture of Barber's finances.

Even with the benefit of hindsight and full discovery into Barber's lies, a number of witnesses testified with oft-conflicting opinions about the proper way of completing the bankruptcy filings. Witness David Nixon, a bankruptcy expert, called a bankruptcy for a debtor who owned over twenty different business entities a complex "nightmare." (Tr. Day 7 pg 1404). He further stated that bankruptcy law is a "specialty unto itself," then detailed the complex issues surrounding the reporting requirements for various questions on the bankruptcy filings. (*Id.* at 1411-20).

For example, EIA's income was not listed on the bankruptcy petition, and the Government asserted at trial that this was clear evidence of bankruptcy fraud. (Tr. Day 9 pg 1752). However, expert witness Nixon testified that a Chapter 7 personal bankruptcy petition does not require the debtor to report the income of any owned business entities. (Tr. Day 7 pgs 1405-07). Nor should a debtor report entity bank accounts. (*Id.* at 1407). The Government's own bankruptcy expert, Jill

23

Jacoway, said that her forty-year opinion of required disclosures changed just two weeks before she testified. (Tr. Day 9 pgs 1670-71). She acknowledged that the questions raised by Barber's bankruptcy touched on uncertain areas of the law in which reasonable attorneys could have good-faith different interpretations of the law. (Tr. Day 9 pg 1670).

### E. FUNDS WERE PROPERLY RECEIVED AND DISBURSED BY KNIGHT VIA HIS IOLTA ACCOUNT.

The movement of funds in and out of Knight's IOLTA account is foundational to this case. These funds are the sole basis for Counts 1, 2 and 4-8; and these funds are also pivotal to Count 3. At the risk of some slight overlap, this section categorizes generally the sources of funds deposited into Knight's IOLTA account then later disbursed at Barber's request. Knight accepted funds into his IOLTA account in two separate roles: as Barber's attorney, and as an escrow agent pursuant to a valid escrow agreement that was a part of a real estate transaction involving Barber.

### 1. FUNDS KNIGHT RECEIVED AS BARBER'S ATTORNEY

As this Court is well aware, client funds in an attorney's trust account remain the client's funds. (*See*, Tr. Day 7 pg 1240). The attorney has no independent ability to control those funds or say how

24

they are dispersed. (*Id.*). Extensive testimony and documentary evidence were introduced regarding Knight's handling of Barber's funds. The arrangement began with a crisis: In April 2008, First State Bank force-closed all Barber related accounts and issued several cashier's checks totaling approximately $52,000. (DX 34, Tr. Day 4 pg 655). Lying to Knight, Barber claimed to have no active bank accounts, and stated that payments for payroll and necessary bills could not be made. (*Id.*). At this moment, Barber was late for a flight to attend an autism event in support of his son. (Tr. Day 8 pgs 1470-71). Under these circumstances, Knight agreed to deposit the $52,000 into his IOLTA account. (GX 37, GX 89, Tr. Day 4 pg 661 et seq). Those funds were then dispersed at Barber or Bennett's direct instructions for a host of business expenses. (*See, e.g.*, DX 35, 36, 37).

A portion of the $390,000 Spring Creek proceeds eventually reached Knight's trust account, but Barber never told Knight the funds were actually proceeds from the Spring Creek transaction. In June 2008, Barber deposited a $50,000 cashier's check into his Priority Bank account. (GX 86). He then issued a $50,000 cashier's check drawn on Priority Bank to Knight for overdue attorneys' fees—with no reference to Spring Creek. (GX 88).

Appellate Case: 14-2651    Page: 33    Date Filed: 01/21/2015 Entry ID: 4236142

Over the next two months, Barber transferred the remaining $340,000 from the Spring Creek transaction among his personal bank accounts six times, expending approximately $150,000 in the process. (*See* GX 86, 87). There was no evidence presented that Knight was aware of these transfers. Eventually, on August 13, 2008, Knight received a $191,000 wire transfer from Barber to the Knight Law Firm's operating account. (DX 68, GX 88). Of that amount, Knight left $40,000 in the operating account with Barber's permission for payment of legal fees and transferred the remaining $151,000 to the IOLTA account. (Tr. Day 8 pg 1486).

Knight testified that he "had no idea" that either the previous $50,000 cashier's check from Barber's personal account or the $191,000 wired from Barber's personal account were actually proceeds of the Spring Creek transaction. (Tr. Day 8 pg 1568).

Also in August 2008, Priority Bank force-closed Barber's accounts and issued a cashier's check for over $96,000. (DX 72). Those funds were deposited into the IOLTA account. (*Id.*). All but $1,200 of those funds were subsequently wired by Knight at Barber's direction to Citibank to satisfy Barber's credit card balance. (DX 72).

26

In October 2008, Knight received a $314,000 wire from Jeff Whorton. As previously discussed in relation to the Executive Plaza deal,[6] Barber lied to Knight about the purpose and nature of the funds, saying it was a loan rather than a payment. *See also* Tr. Day 8 pg 1483; DX 82). Knight followed Barber's instructions as to the receipt and handling of these funds.

In November 2008, Barber directed Knight to wire Van Doren $150,000 as part of a plan for Barber to invest in Epsilon and work out real estate deals on Van Doren's behalf. (GX 24). Knight stated, "I understood that they [Barber and Van Doren] were trying to buy some property. I knew that they were having discussions with the Bank of Fayetteville related to that…." (Tr. Day 8 pg 1479). This fact was substantiated by internal records from the Bank of Fayetteville. (DX 121, 124). But, the transaction with Bank of Fayetteville did not materialize. Realizing the opportunity to mitigate his losses from prior bad deals with Barber, Van Doren eventually used all but $27,000 of the $150,000 to satisfy Epsilon debt. (Tr. Day 2 pg 267 et seq). Van Doren testified that, given Knight's limited information, it was reasonable for Knight to understand that Barber transferred the $150,000 in connection

---

[6] *See* pages 16-18.

Appellate Case: 14-2651     Page: 35     Date Filed: 01/21/2015 Entry ID: 4236142

with a failed attempt to secure a loan with the Bank of Fayetteville to pursue further commercial real estate deals. (*Id.* at 276-83).

In sum, Knight acted within the Arkansas Rules of Professional Conduct regarding the handling of Barber's funds. Knight had no obligation to inquire into the source and nature into the funds he received in the course of his representation of Barber. (Tr. Day 7 pg 1240). Barber was a talented liar; every fact witness testified that Barber lied to them consistently, frequently, and even when it wasn't for financial gain. (*See, e.g.* Tr. Day 2 pg 276) (Van Doren testifying that Barber was "one of the best" liars). After reviewing the evidence in the case, attorney John Everett offered expert testimony that, based on his over forty years of experience, "Knight handled his trust account appropriately; that it was consistent with the Rules of Professional Conduct and consistent with his obligation to his client and a client's expectations of what the lawyer does with his money." (Tr. Day 7 pg 1243).

### 2. FUNDS KNIGHT RECEIVED WHILE ACTING AS ESCROW AGENT

Knight acted as escrow agent as a last-minute replacement after Ken Hall gave a pretense for removing himself as the planned escrow agent. (Tr. Day 8 pgs 1474-75, 1504). Knight acted in accordance with the escrow agreements between Barber on behalf of EIA and Van Doren

on behalf of Epsilon. (*See* GX 12, 13). Van Doren's understanding of the escrowed funds was that, as Barber satisfied his promise to find buyers for Epsilon's four Timber Trail homes, commensurate escrow funds could be released to EIA. (Tr. Day 2 pg 127). Those homes were generally indebted for $150,000 each. Additionally, the escrow funds included initial payments of $65,000 to Epsilon for incurred losses and $25,000 for the "incentive payment" for agreeing to assume liability on the Barbers' personal residence as part of the Ballpark deal. (*Id.* at 129).

Barber honored his agreement to find buyers for all the Timber Trail homes, and accordingly Knight released the escrowed funds to EIA. (Tr. Day 2 pg 149). Those funds were sometimes released prior to the sale of a Timber Trail home, but this is consistent with Barber and Van Doren's subsequent agreement to release some of the funds early. (*Id.*) Extensive testimony and documentary evidence was introduced at trial showing Knight's consistent efforts to follow the escrow agreement between Knight and Van Doren. (DX 31, 33, 44, 46, 53, 54. *See also* DX 1, 2, 27, 111, 112, 115, 116, 119, 120, 121, 124, 132, 180, 181 *and* GX 18, 19). In sum, Van Doren could not identify a single instance in which Knight acted without authority when releasing escrow funds to EIA. (Tr. Day pg 201 et seq). As the District Court determined after

Appellate Case: 14-2651    Page: 37    Date Filed: 01/21/2015 Entry ID: 4236142

thoroughly reviewing all the evidence, Knight accepted the role of escrow agent at the suggestion of a reputable lawyer from a reputable firm. (DCD 208 pg 67). He accepted funds, as escrow agent, pursuant to an agreement signed by two consenting parties. He then disbursed the funds in accordance with the agreement and at the direction of the parties.

Stark Ligon, director of Arkansas' Office of Professional Conduct, opened an investigation into Knight's handling of the $688,000 of escrowed funds resulting from the Ballpark deal. (Tr. Day 7 pgs 1284-85; GX 107). After receiving twenty-one exhibits related to the Ballpark deal and interviews with Ken Hall and Judge Barry (whose opinion on the adversarial proceeding in Barber's personal bankruptcy prompted Ligon's investigation), Ligon found no reports of ethical violation and closed the file. (Tr. Day 7 pgs 1240, 1287-98, GX 107).

Appellate Case: 14-2651     Page: 38     Date Filed: 01/21/2015 Entry ID: 4236142

# SUMMARY OF ARGUMENT

This appeal arises from a post-trial motion for acquittal and/or new trial by Defendant/Appellee, K. Vaughn Knight. (DCDs 208, 184, 185). Chief Judge P.K. Holmes, III, granted a new trial on seven of the eight charges: Count 1 Conspiracy to Commit Bankruptcy Fraud, 18 U.S.C. §§ 371 and 157; Count 2 Bankruptcy, 18 U.S.C. § 152(7); and Counts 4-8 Money Laundering, 18 U.S.C. § 1957. (DCD 208 pg 101 and DCD 157). Further, the District Court granted Knight's motion for acquittal on Count 3 False Statements 18 U.S.C. § 152(3). (DCD 208 pg 101).

In rendering the 102-page Opinion and Order, Judge Holmes, found that "a miscarriage of justice may likely have occurred" in the jury's verdict, and accordingly, he correctly concluded that a new trial was warranted on Counts, 1, 2 and 4-8. (DCD 208 pgs 1, 99-100, 101). Further, the District Court correctly acquitted Knight on Count 3 because there was insufficient evidence to support the convictions. (DCD 208 pgs 96, 101).

## Count 1: Conspiracy to Commit Bankruptcy Fraud and Count 2: Bankruptcy Fraud

Knight was charged with these offenses on the basis of deposits accepted into his IOLTA account. None of these deposits were accepted "in contemplation of bankruptcy." Quite the opposite is true. Knight

31

accepted deposits, both as Barber's attorney and as escrow agent, in furtherance of Barber's efforts to remain financially solvent. Funds from Knight's IOLTA account were used to pay debts that would have been dischargeable in bankruptcy. Furthermore, Knight held no money for Barber after January 2009 which was more than six months before the bankruptcy petition was filed. Knight did not commit bankruptcy fraud.

Likewise, Knight did not conspire to commit bankruptcy fraud because there was no scheme to defraud. Knight did not know of such a scheme and certainly did not intentionally act to advance such a scheme.

The District Court correctly determined that the jury may have convicted Knight because of "guilt by association" with Barber and correctly found that a new trial was warranted.

### Count 3: Making False Statements

The District Court acquitted Knight on this charge because it found that the evidence was insufficient to establish beyond a reasonable doubt that Knight knew Barber was making a false statement on his Statement of Financial Affairs ("SOFA"). Knight was charged with aiding and abetting Barber in making false statements on Barber's SOFA. The evidence at trial established that Knight instructed Barber to make a full and accurate accounting. Barber, however, lied when Knight requested

Appellate Case: 14-2651     Page: 40     Date Filed: 01/21/2015 Entry ID: 4236142

financial information and further lied on his bankruptcy petition. The District Court correctly determined that Knight did not share Barber's criminal intent and that it was not reasonable for the jury to have entered a guilty verdict.

## Counts 4-8: Money Laundering

Once again, the sole basis for these charges was that Knight accepted deposits into and transfers out of his IOLTA account. These charges necessarily fail if there was no bankruptcy fraud because the only alleged unlawful activity was said fraud. The District Court correctly found that the evidence preponderated against a finding that bankruptcy fraud had occurred.

## The District Court's Opinion and Order

The judge in this case is an experienced Federal District Judge and former U.S. Attorney. He presided over the entirety of the nine-day trial, observed the witnesses and conducted "a thorough and exhaustive review" of all the evidence. (DCD 208 pg 3). Consequently, his evaluation of witness credibility, of the nature of the evidence presented and of the jury's deliberation should be given "considerable deference." *Townsend v. Bayer Corp.,* No. 13-1468, 2014 WL 7172031, at 10 (8th Cir. Dec. 17, 2014)(evaluating a motion for new trial based upon an

33

evidentiary ruling). The June 10, 2014 Opinion and Order provides extensive explanation and a thoughtful basis for granting the motion for new trial on Counts 1, 2 and 4-8. (DCD 208). In part, the District Court concluded:

> "Although the Government's closing request was for the jury to rely on its common sense in deciding this case, there was not much about this case that lent itself to a common-sense analysis. This was one of the most technical and complex cases the Court has tried." (DCD 208 pg 2 emphasis added).

> \* \* \*

> "After a nine-day trial and the admission of thousands of pages of documents into evidence, the jury returned a verdict on all counts in approximately six hours. \* \* \* Because of the difficulty of the task the jury faced, the relative speed of the verdict indicates that the jury may not have given the evidence the due deliberation that justice required. More importantly \* \* \* the Court finds that the nature, quantity and character of the evidence as to Counts 1, 2 and 4-8 is such that the Court is left with significant concerns that a miscarriage of justice may likely have occurred." (DCD 208 pgs 99-100 emphasis added).

34

"[T]he Government's evidence largely invited only speculation and conjecture. The jury was left to consider Knight's criminal intent with little more than his status as Barber's lawyer.

\* \* \*

The weight of the evidence in this case is not in favor of finding that Knight was a corrupt attorney who was knowingly and intentionally furthering the crimes of his client. While Knight may have exercised poor judgment in allowing Barber to use his trust account as a bank account, the evidence did not convince the Court that Knight must therefore also be guilty of criminal conspiracy, bankruptcy fraud, and money laundering.

\* \* \*

[I]t is far too plausible in this case that the jury rested its guilty verdicts on Counts 1, 2 and 4-8 on guilt by association. The facts of this case were complex, the applicable law was technical and confusing, and the presentation of evidence did not serve to clarify either the facts or the law. The gaps left by the evidence presented were too large to be reasonably filled by inference without leaving some doubt as to the correctness of the verdict. The Court finds that the verdicts of guilty as to Counts 1, 2, and

35

4-8 are tainted by legitimate concerns as to whether justice was properly served. In the interests of justice, the Court will therefore set aside the guilty verdicts as to Counts 1, 2, and 4-8 and grant Knight's motion for a new trial as to those Counts." (DCD 208 pgs 100-101 emphasis added).

The District Court's decision "deserves considerable deference" as it was in "the best position" to evaluate the witnesses, the evidence and also the jury to determine if a miscarriage of justice occurred. *Townsend, supra*.

The District Court also correctly found "that the evidence presented at trial was insufficient to sustain a guilty verdict on Count 3." (DCD 208 pg 101). This finding is reviewed *de novo*, but a reasonable juror could not have found Knight guilty because there was insufficient evidence as to all elements of this offense. (DCD 208 pg 96); *United States v. Foster*, 740 F.3d 1202, 1205 (8th Cir. 2014).

As will be discussed in detail below, the District Court's Opinion and Order should be affirmed in full because the Court was well within its discretion and its decision was amply supported by the evidence.

# ARGUMENT

## I. THERE WAS NO ABUSE OF DISCRETION IN GRANTING A NEW TRIAL, AND THE DISTRICT COURT'S ORDER SHOULD BE AFFIRMED.

### A. STANDARD OF REVIEW FOR GRANTING A NEW TRIAL ON COUNTS 1, 2 AND 4-8.

A district court "may grant a new trial . . . if the interests of justice so require." (Fed. R. Cr. P. 33(a)). Further, the district court has "quite broad discretion" in deciding to grant a motion for new trial. *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002); *United States v. Huerta-Orozco*, 272 F.3d 561, 566 (8th Cir. 2001). With that broad discretion, the Court can

> "rely on its own reading of the evidence. [I]t can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."
>
> *White v. Pence*, 961 F.2d 776, 779-80 (8th Cir. 1992).

In this case, the District Court recognized that a new trial under Rule 33 should be granted "sparingly and with caution," but found that the jury's verdict was based upon speculative evidence and guilt by association. (DCD 208 pgs 100-101), *Campos*, 306 F.3d at 579.

37

The Opinion and Order should only be reversed if the District Court abused its discretion. *Huerta-Orozco*, 272 F.3d at 566. The abuse of discretion standard is familiar:

> "An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment."

*Huerta-Orozco,* 272 F.3d at 566. It is obvious the District Court carefully weighed <u>all</u> of the evidence. The Opinion and Order is thorough—presenting an excellent summary of the voluminous testimony and documentary evidence.

The District court found that guilty verdicts on Counts 1, 2 and 4-8 were "tainted by legitimate concerns as to whether justice was properly served." (DCD 208 pg 101). With these legitimate concerns regarding the justice of the guilty verdicts, the District Court properly granted a new trial. Fed. R. Cr. P. 33(a). In deference to the District Court's "wide discretion," this appellate court "must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Hiser v. XTO Energy, Inc.,* 768 F.3d 773, 776 (8th Cir. 2014)(emphasis in original).

38

The District Court did not abuse its discretion. The Opinion and Order was meticulous and included all of the relevant facts. The Opinion is well-reasoned and carefully analyzes the elements of each charge and the evidence presented. The Court found that "[i]n the interests of justice" the guilty verdicts should be set aside for Counts 1, 2 and 4-8. This finding is well within the District Court's discretion and is well-supported by the evidence.

## B. ARGUMENT

### 1. NEW TRIAL WAS APPROPRIATE ON COUNT 1: CONSPIRACY TO COMMIT BANKRUPTCY FRAUD

In order for Knight to be convicted of conspiracy to commit bankruptcy fraud, the Government was required to establish, beyond reasonable doubt, that: (1) an agreement existed between Knight and Barber to commit bankruptcy fraud; (2) Knight knew of the agreement; and (3) Knight intentionally joined the agreement. *Foster*, 740 F.3d at 1205 (discussing conspiracy to commit fraud generally). The Appellant states that the "Government had to show that Knight knowingly agreed to hide Barber's money from creditors by transferring it 'to and through accounts belonging to' Knight and Van Doren." (AB 35). While this is a

Appellate Case: 14-2651     Page: 47     Date Filed: 01/21/2015 Entry ID: 4236142

recitation of a portion of the jury instructions, it fails to include the bankruptcy element of the charge.

It is well established that there can be no conspiracy without "at least the degree of criminal intent necessary" to commit the underlying offense. *United States v. Calhoun*, 721 F.3d 596, 601-02 (8th Cir. 2013), *reh'g denied* (Sept. 6, 2013). The offense, as charged by the Government, is bankruptcy fraud. (DCD 157 pgs 3-5). Specifically, the Government alleged that Knight "did knowingly and intentionally" "conspire and agree [with others]" to knowingly and fraudulently devise a scheme and then for the purpose of executing and concealing this scheme filed a bankruptcy filings. (DCD 157 pgs 3-4). Appellant's brief attempts to shift the discussion from the requirements of the charge "conspiracy to commit bankruptcy fraud" to the irrelevant requirements of "conspiracy to commit fraud" generally. The charge was "conspiracy to commit bankruptcy fraud," so the elements and necessary *mens rea* for bankruptcy fraud are essential to this charge of conspiracy. *See Calhoun, supra*; *United States v. Feola*, 420 U.S. 671, 686 (1975)("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal

Appellate Case: 14-2651    Page: 48    Date Filed: 01/21/2015 Entry ID: 4236142

intent necessary for the substantive offense itself.")(superseded by statute on issue not related to present case).

As will be discussed further below,[7] Knight did not commit bankruptcy fraud. If Barber had a scheme to defraud in his bankruptcy, then Knight had no knowledge of it and did not intentionally participate in any such scheme. The Government's sole basis for accusing Knight of bankruptcy fraud and conspiracy is that Knight accepted deposits into and transferred funds out of his IOLTA account. (DCD 157 pg 6).

At the outset, Knight could not have committed this underlying offense because none the deposits were accepted "in contemplation of [Barber's] bankruptcy."[8] Furthermore, funds from Knight's trust account were used to pay a variety of creditors.[9] Barber did not contemplate or intend to file bankruptcy until July 2009, the week bankruptcy was actually filed.[10] Because Knight did not (and could not) have the mental intent to commit bankruptcy fraud, he did not and could not commit the offense of conspiracy to commit bankruptcy fraud.

---

[7] *See* pages 45-55.
[8] *See* pages 46-53.
[9] *See* pages 49-51.
[10] *See* pages 51-53.

Appellate Case: 14-2651    Page: 49    Date Filed: 01/21/2015 Entry ID: 4236142

In the case of *United States v. Edgar*, this Court discussed the bankruptcy fraud and conspiracy to commit bankruptcy fraud committed by an attorney who assisted his client/debtor in selling his business and hiding the proceeds during the course of an on-going bankruptcy. 971 F. 2d 89, 95 (8th Cir. 1992). On its face, the facts of *Edgar* are materially different from the present case. However, the facts of *Edgar* itself and of the Court's hypothetical scenario therein provide a useful comparison to Knight's actions.

The Court-constructed hypothetical in *Edgar* assumes that a debtor has one asset, a $5,000 painting encumbered by a debt of $1,000. (*Id.*). The debtor and a third party agree to fraudulently conceal the painting, with the third party taking possession of the painting. (*Id.*). The debtor then files for bankruptcy, but he does not disclose the painting in the third party's possession. (*Id.*). The third party could be found guilty of bankruptcy fraud <u>if the third party "clearly intended to deprive the creditors</u>" of the $1,000 they were owed. (*Id.*)(emphasis added).

Comparing Knight's accepting deposits into his IOLTA account to *Edgar*, several significant differences appear. First, Knight held none of Barber's money or property during Barber's bankruptcy case. In fact, Knight made the last disbursement of any funds belonging to Barber

42

more than six months before bankruptcy was filed. (DCD 208 pg 38, GX 118). Second, Knight did not know of any scheme to defraud the bankruptcy court and did not clearly intend to deprive creditors in Barber's bankruptcy. On the contrary, Knight advised Barber to properly disclose his income on the bankruptcy petition, and Knight repeatedly requested correct financial information from Barber and Barber's accountant. (DX 110, Tr. Day 5 pg 953). Barber, however, lied to Knight and provided inaccurate and incomplete information. (DX 96, Tr. Day 5 pg 953). Barber deliberately concealed assets from both Knight and the bankruptcy court during the bankruptcy proceedings. Knight testified that "Mr. Barber was carrying on lots of business that was unbeknownst to me throughout the time that I was representing him." (Tr. Day 8 pg 1559).

> The District Court accurately summarized the situation:
>
> "The Government presented a lot of evidence as to Barber's activities. However, any evidence as to the extent of Knight's knowledge of and involvement in Barber's schemes was largely speculative and based generally on the fact that Knight was Barber's lawyer. The testimony revealed that the witnesses, except for Knight himself, had

43

little to no direct personal knowledge of the extent of Knight's knowledge of or involvement with any conspiracy to commit bankruptcy fraud." (DCD 208 pg 37).

While Barber may have conspired to defraud the bankruptcy court, Knight did not. In order to find that Knight had actual, fraudulent intent, "there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose." *In re Addison,* 540 F.3d 805, 813 (8th Cir. 2008)(discussing bankruptcy fraud in a civil context).

In this case, the Government accused Knight of fraud based upon deposits and disbursements made through his firm's account and presented only evidence that those deposits and disbursements were made. This evidence alone is not sufficient to establish that Knight acted with fraudulent intent. More accurately, the evidence serves to establish the Government's unfortunate ignorance of the purposes and limitations governing an attorney's handling of a client's money. This lack of understanding likely led to Knight's indictment in the first place. Agent Williams testified to the indicting Grand Jury that an attorney's trust account could be used for lawsuits, for example car wrecks, and "that's

my understanding all it's supposed to be used for." (Tr. Day 6 pgs 1069-70). His woefully inaccurate description of the purposes of an IOLTA account, elicited by the Government's attorneys, indicates a misinformed belief by the Government that transactions through Knights trust account must automatically equal intend to defraud. Furthermore, additional evidence at trial preponderates against a finding of fraudulent intent.

The District Court considered both a motion to acquit and a motion for new trial on Count 1. It denied the motion to acquit, but determined that a new trial was warranted because the Court found that (1) no conspiracy to commit bankruptcy fraud existed; (2) Knight did not know of any such conspiracy; (3) Knight did not join any agreement with the intent to defraud the bankruptcy court. (DCD 208 pg 39). Thus, none of the elements of Count 1 were established. The evidence presented at trial amply supports the District Court's finding. The District Court did not abuse its discretion in granting a new trial on Charge 1: Conspiracy to Commit Bankruptcy Fraud and should be affirmed.

### 2. A NEW TRIAL WAS PROPER BECAUSE KNIGHT DID NOT COMMIT BANKRUPTCY FRAUD.

Knight was charged with bankruptcy fraud pursuant to 18 U.S.C. § 152(2) and (7). (DCD 157 pg 6). Thus, the Government had to establish beyond a reasonable doubt that Knight:

45

"(2) knowingly and fraudulently ma[de] a false oath or account in or in relation to any case under title 11;

* * *

(7) in a personal capacity or as an agent or officer for [Brandon Barber], in contemplation of a case under title 11 * * * with intent to defeat the provisions of title 11, knowingly and fraudulently transfer[red] or conceal[ed] any of [Barber's] property . . . ."

The Government's evidence at trial, however, "was thin," "not strong" and "required numerous inferential leaps" to assume fraud. (DCD 208 pgs 41, 86-87). The District Court correctly granted a new trial because the evidence of Knight's intent to defraud "preponderated sufficiently heavily against a verdict of guilty" that "a miscarriage of justice may have occurred." (DCD 208 pg 87).

> ### (a) None of Knight's actions were in contemplation of bankruptcy and therefore cannot constitute bankruptcy fraud.

Because of its significance to the facts of this case, the statutory requirement that acts be made "in contemplation of bankruptcy" will be addressed first. 18 U.S.C. § 152(7). This issue was heavily argued in the parties' post-trial motions. The Government argued and continues to

46

argue that the mere mention of the word "bankruptcy," even as an undesirable alternative, constitutes "in contemplation of" bankruptcy. (AB pgs 49, 52, DCD 191 pgs 3-6). Knight asserts the U.S. Supreme Court's applied definition of the phrase: in contemplation of bankruptcy "require[s] that the portended bankruptcy [ ] induced the transfer at issue." *Milavetz v. U.S.*, 559 U.S. 229, 243 (2010).[11] In the Supreme Court's words, "the impelling reason" for the actions must have been "the anticipation of bankruptcy." *Id. at 246.*

Similarly, a recent 8th Circuit case provides a consistent definition of the word "contemplation," though outside of the context of bankruptcy. *United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011). In *Yielding*, this Court determined that the phrase "in contemplation of" means "a matter that was not yet pending but which the defendant

---

[11] *Milavetz v. United States,* 559 U.S. 229 (2010), was a pre-enforcement action seeking declaratory relief from the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *Id.* at 231-32, 234. The crux of the case centered on the statutory phrase "in contemplation of such person filing" a bankruptcy petition. *Id*. at 235 (citing 11 U.S.C. § 526(a)(4)). Although not dealing with precisely the same statute, the holding in *Milavetz* regarding the meaning and application of "in contemplation" of bankruptcy is directly applicable here because the exact phrase "in contemplation" of bankruptcy is contained in 18 U.S.C. § 152(7).

Appellate Case: 14-2651    Page: 55    Date Filed: 01/21/2015 Entry ID: 4236142

envisioned or anticipated." (*Id.*). Perhaps the most succinct and statute-specific definition comes from the Seventh Circuit:

> "A person acts 'in contemplation of bankruptcy proceeding' if he acts in expectation of, or planning for, the future probability of a bankruptcy proceeding."[12]

The only allegations of bankruptcy fraud stem from deposits and disbursements of Barber's money through Knight's trust account. (DCD 157 pgs 4-6). Combining the definitions of "in contemplation" from *Milavetz, Yielding* and the Seventh Circuit with the statutory requirements of 18 U.S.C. § 526(a)(7), the proper question then is: <u>Whether Knight, as attorney for Barber, accepted monies into his trust</u> <u>account with the expectation of Barber's planned bankruptcy in order to</u> <u>knowingly and fraudulently transfer or conceal any of Barber's property</u> <u>from the bankruptcy proceedings.</u>

Knight has always admitted that he accepted funds from Barber and disbursed those funds pursuant to Barber's directions. (Tr. Day 8 pg 1470, GX 108, GX 118). In total, there were seven deposits made

---

[12]Fed. Crim. Jury Instr. 7th Cir. 18 U.S.C. §152(7) Definition of "In Contemplation of Bankruptcy Proceeding" (2012 ed.) *available at* the United States Seventh Circuit Court of Appeals' Appeals website at http://www.ca7.uscourts.gov/Pattern_Jury_Instr/7th_criminal_jury_instr. pdf at page 141 (last visited visited January 10, 2015).

48

between April and October of 2008.[13]  (Tr. Day 8 pg 1470).  These deposits were accepted either as Barber's attorney or as escrow agent, and Knight handled the funds ethically and legally.

Knight did not hold <u>any</u> of Barber's assets during the period of six months prior to the bankruptcy filing.  (DCD 208 pg 38, Tr. Day 6 pg 1120, GX 118 pg 3)(showing balance of $0.00 as of January 2009).  This six-month time gap is indicative of an absence of any intent to defraud and that the prior transfers were not made "in contemplation of bankruptcy."  Appellant contends that the time gap between the trust account transfers and the bankruptcy filing is "not a proper basis" for a new trial.  (AB 51).  In support of this proposition, Appellant cites case law which is predicated upon facts that are markedly different from the present case.  In that case, the debtor did not challenge the *mens rea* element of fraud, and merely argued the court's jurisdiction over transactions which occurred more than a year before bankruptcy was filed.  (AB 51)(*citing United States v. West*, 22 F.3d 586, 589, 589 n. 8, 590 (5th Cir. 1994)).  In contrast, Knight has not challenged the bankruptcy court's jurisdiction, but has consistently stated that there was no intent to defraud the bankruptcy court.

---

[13] *See* pages 24-30.

Appellate Case: 14-2651    Page: 57    Date Filed: 01/21/2015 Entry ID: 4236142

The transaction history of deposits to and withdrawals from the trust account, as well as the six-month period where Knight held no funds, are evidence that Knight, as general counsel, was assisting his client in continuing business and personal solvency. At the outset, there could be no knowing or fraudulent transfers or concealment "in contemplation of bankruptcy" because there was no plan for bankruptcy. Every transfer, transaction and deal was enacted with the purpose of minimizing Barber's debt and maintaining his financial solvency. (Tr. Day 2 pgs 184, 194; Tr. Day 3 pgs 510, 517-18; Tr Day 6 pgs 1118-19; Tr. Day 7 pgs 950, 952; Tr. Day 8 pg 1564).

Out of the funds held in the trust account, Knight made multiple payments for Barber's routine expenses and debts, many of which would have normally been dischargeable in bankruptcy. In each case, Barber instructed Knight to issue various payments and checks, and Knight then disbursed funds from the trust account accordingly. Even according to the Government's summary of expenditures, there are multiple examples of Barber's funds being transferred from Knight's trust account to pay dischargeable debts. Barber's funds held in Knight's trust account were used to make payroll, (GX 118, Apr. 2, 2008) to pay for Barber Group's utilities, and other operating expenses. (GX 118, Apr. 2, 2008)(payment

50

to Cox Communications; Apr. 25, 2008 payment to Wanda Lanier, CPA; May 9, 2008 payments to Hearth and Home; May 21, 2008 payment to Joe's Masonry and etc.). More than $90,000 was used to pay Barber's credit card bill. (DX 72).

Funds from the trust were also used to make interest payments on existing debt obligations. On April 7 and 11, 2008, checks were issued from Knight's trust account to ANB Financial and the Bank of Fayetteville for interest payments owed pursuant to existing loan agreements. (GX118, Apr. 7, 2008 and April 11, 2008). On May 7, 2008, Knight issued a check to Justin Traweeks arising from a lien. (DX 58). On June 25, 2008 two checks were issued to First Federal Bank for interest payments on the Epsilon loan related to the Ballpark transaction. (DX 65, GX 118). On July 15, 2008 another loan payment was made to Bank of Fayetteville from the trust account. (DX 65, GX 118). Knight also used funds held in the trust account to pay judgment creditors. (GX 118, Apr. 15, 2008 payment to Kimbel Mechanical Systems). There is simply no rational way to construe the payment of Barber's creditors as "knowingly and fraudulently transfer[ing] or conceal[ing]" property with the intent to defraud the bankruptcy court. 18 U.S.C. § 152(7). This is

51

especially so where the payments were made 18 to 6 months before Barber decided to file for bankruptcy.

As for the transactions being in anticipation of bankruptcy, the evidence overwhelmingly established that Barber was doing everything he could think of to avoid bankruptcy. Knight testified,

> "for me to sit here and tell this jury that we never discussed the word 'bankruptcy' would not be correct. Anytime I did mention bankruptcy with Brandon Barber, he was adamant that he was not going to file bankruptcy." (Tr. Day 8 pg 1564).

Witness after witness testified to the same thing: Barber refused to consider filing bankruptcy until just days before he actually filed for bankruptcy.

Government witness Bracey, a Barber Group employee, testified that Barber was "trying to figure out ways to * * * rework [his debt]" because "[h]e still had some hope of not taking bankruptcy" and "did not want to file bankruptcy." (Tr. Day 3 pgs 510, 517-18). Another Government witness, James Van Doren, testified that in 2008, Barber intended to find a way "to get out of this [financial] mess" and was "absolutely trying to avoid taking personal bankruptcy" throughout 2008.

52

(Tr. Day 2 pgs 184, 194). Another witness testified that as of March 2009, Barber had "no intention of filing bankruptcy" and was working to resolve his debts. (Tr. Day 6, pgs 1118-19).

Agent Kimbrough testified that Barber was emphatic that he did not want to file bankruptcy and further testified that Barber did not decide to file bankruptcy until the same week the petition was filed. (Tr. Day 7 pgs 950, 952). It is important to note that this statement to Kimbrough was made months before Barber was charged with any crime, and well in advance of anyone suggesting that Vaughn Knight had participated in a conspiracy to commit bankruptcy fraud. (Tr. Day 6 pgs 1118-19)(Agent Kimbrough first interviewed Barber in June 2011).

Knight had every reason to believe that Barber did not intend to file bankruptcy. At one point, Barber emailed Knight, and happily reported that he had reduced his "debt from $269 million to $38 million as of November 2008"; Knight responded that this progress was "Amazing!!!". (GX 24). Knight testified that Barber had made it very clear that bankruptcy was not an option. (Tr. Day 8 pg 1498).

The District Court correctly concluded that it could not

"view the evidence as supporting a finding that Knight

concealed or transferred money through his trust account in

53

contemplation of Barber's bankruptcy when it appears that even Barber himself structured these transactions in an attempt (although perhaps misguided) to work his way out of debt and to *avoid* bankruptcy." (DCD 208 pg 54)(emphasis in original).

This finding was overwhelmingly supported by the evidence. Testimony from all witnesses confirmed that Barber did not want to file bankruptcy and had no intention of filing bankruptcy until the week it was filed in July 2009.

### (b) Knight did not commit bankruptcy fraud.

Simply put, Knight did not commit bankruptcy fraud. There was no "contemplation of bankruptcy" during any of the time periods in which Knight accepted deposits to and made payments from his trust account. The District Court correctly summarized the evidence and the law thus:

"By requiring that a person knowingly and fraudulently transfer or conceal property in contemplation of a case under Title 11, the language of the statute itself requires that the proscribed actions of transferring or concealing property be linked to the contemplation of bankruptcy at the time the

54

proscribed act occurs.   A person does not act 'in contemplation of' bankruptcy by virtue of the fact that he has had a conversation about bankruptcy and then sometime later transfers or conceals property, having already put that conversation or any other thought of bankruptcy out of his mind."  (DCD 208 pg 50 omitting citing.)

In this case, the evidence was overwhelming that Barber, with Knight's assistance, was acting with the sole intent of <u>avoiding</u> bankruptcy.  All of the deposits into Knight's trust account were made with the intent of continuing Barber's personal and business solvency.  The monies from the trust account were used to pay creditors, including multiple debts that would have been dischargeable in bankruptcy.  Surely if Barber intended to hide funds in Knight's IOLTA account in anticipation of bankruptcy, he would not have instructed Knight to pay off debts that would otherwise be dischargeable.

Weighing the whole of the evidence presented, the District Court found that "the evidence presented at this trial preponderated against a finding that the 'contemplation of bankruptcy' was the 'impelling' cause in Knight allowing Barber to transfer funds through Knight's trust account."  (DCD 208 pg 52); *Milavetz*, 559 U. S. at 246.  The Court's

55

determination that a new trial was warranted on this issue should not be overruled unless there was an abuse of discretion. In this case, the evidence and the law amply support the District Court's findings and they should be affirmed.

### 3. A NEW TRIAL WAS PROPER ON COUNTS 4-8 BECAUSE THE EVIDENCE OF MONEY LAUNDERING PREPONDERATED AGAINST THE VERDICT.

The Government charged Knight with money laundering with respect to four specific deposits into his trust account. (DCD 157 pgs 7-10). Specifically, Counts 4-8 were for individual deposits which "derived from * * * bankruptcy fraud." Thus the Government was required to establish beyond a reasonable doubt that (1) Knight "conducted a financial transaction involving the proceeds of [bankruptcy fraud];" (2) that Knight "knew the proceeds involved in the transaction were the proceeds of [bankruptcy fraud]"; and (3) that Knight "intended to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." *United States v. Pizano*, 421 F.3d 707, 725 (8th Cir. 2005)(internal quotation removed); *see also* 18 U.S.C. § 1957(a)(requiring the Government establish that Knight "knowingly engage[d] or attempt[ed] to engage in a

Appellate Case: 14-2651    Page: 64    Date Filed: 01/21/2015 Entry ID: 4236142

monetary transaction * * * [with a] value greater than $10,000 and [that] is derived from [bankruptcy fraud].").

But, there was no "contemplation of bankruptcy" at the time these deposits were made into and checks written from Knight's trust account. Furthermore, Knight did not commit bankruptcy fraud. Most importantly, the District Court found "that the evidence preponderates sufficiently heavily against a finding that * * * bankruptcy fraud occurred." (DCD 208 pg 88). Without an unlawful activity from which the money originates, there can be no money laundering. *United States v. Huber*, 404 F.3d 1047, 1057 (8th Cir. 2005). Therefore, there can be no money laundering because the only alleged "unlawful activity" was bankruptcy fraud. The District Court was correct to order a new trial on Counts 4-8.

### 4. THE SPEED OF THE JURY'S VERDICT STRONGLY SUGGESTS THAT THE INTERESTS OF JUSTICE REQUIRE A NEW TRIAL.

A District Court should grant a new trial when the "verdict is against the weight of the evidence," including the court's own "reading of the evidence" and "weigh[ing of] the evidence." *White*, 961 F.2d at 780. Of course, a District Court should not "usurp the functions of a jury which weighs the evidence and credibility of witnesses." *Id. (internal*

57

*citations removed)(citing McGee v. South Pemiscot School Dist.,* 712 F.2d 339, 344 (8th Cir.1983)).  In this case, however, there is strong evidence that the jury did not weigh the evidence or the credibility of the witnesses.  Instead, it very well may have improperly convicted Knight of "guilt by association."  (DCD 208 pg 101).

This Court has found that a new trial is not appropriate "[w]here the subject matter of the litigation is simple; where there exists no complicated evidence or where the legal principles presented are such that they would not confuse the jury . . . ." *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.,* 466 F.2d 179, 187 (8th Cir. 1972)(cited with approval by *White*, 961 F.2d at 781).  The subject matter, the facts and the confusing evidence in this case are the complete opposite of the description in *Fireman's Fund*.  The experienced District Court judge described this case as "one of the most technical and complex cases" he had ever tried.  (DCD 208 pg 2).

In granting a new trial on Counts 1, 2 and 4-8, the District Court concluded in part that

> "[b]ecause of the difficulty of the task the jury faced, the
> relative speed of the verdict indicates the jury may not have
> given the evidence the due deliberation that justice required.

Appellate Case: 14-2651    Page: 66    Date Filed: 01/21/2015 Entry ID: 4236142

More importantly * * * the Court finds that the nature, quantity, and character of the evidence as to Counts 1, 2 and 4-8 is such that the Court is left with significant concerns that a miscarriage of justice may likely have occurred."

(DCD 208 pg 99-100).

The District Court's "significant concern" is well founded. The minutes of the trial reflect that the jury began deliberations at 2:56 on the ninth day of the trial and returned to the courtroom at 4:43 to be dismissed. (DCD 177). Yet after a mere hour and forty-seven minutes, the jury had found Knight guilty on Counts 1 and 2. (DCD 181 pgs 1-2).[14]

In the time it has taken for the reader to reach this point in the Appellee's Brief, the jury had reached a guilty verdict on the most serious charges, Counts 1 and 2. After nine days of testimony and hundreds of exhibits, it is inconceivable that the jury considered the evidence related to Counts 1 and 2 in any meaningful way. Likewise, the jury returned with a guilty verdict on all eight counts after only a total of

---

[14] The Jury's Verdict Forms for Counts 1 and 2 were signed and dated 15 November 2013, the Friday that deliberations began. (DCD 181 pgs 1-2). The remainder of the Jury's Verdict Forms were dated Monday, 18 November 2013. (DCD 181 pgs 3-8). The minutes of the trial corroborate these dates. (DCD 177 and 180).

Appellate Case: 14-2651   Page: 67   Date Filed: 01/21/2015 Entry ID: 4236142

six hours of deliberations.  (DCD 208 pg 99, DCD 177, DCD 180, DCD 181).

The District Court correctly found "that the verdicts of guilty as to Counts 1, 2 and 4-8 [we]re tainted by legitimate concerns as to whether justice was properly served."  This finding should be affirmed and a new trial held to determine Knight's innocence or guilt.

## II. KNIGHT WAS CORRECTLY ACQUITTED ON COUNT 3: MAKING FALSE STATEMENTS UNDER 18 U.S.C. § 152(3).

### 1. STANDARD OF REVIEW

The District Court correctly granted a judgment of acquittal on Count 2 because the "evidence was insufficient" to establish beyond a reasonable doubt that Knight knew Barber was making a false statement as to his 2008 income on the Statement of Financial Affairs ("SOFA") and to establish that a false statement was made within the meaning of 18 U.S.C. § 152(3).  (DCD 208 pg 86).

On appeal, this Court reviews a judgment of acquittal *de novo*. *Foster*, 740 F.3d at 1205.  Accordingly, the review of the evidence is viewed in the light most favorable to the guilty verdict, and all reasonable inferences that are supported by that evidence.  *United States v. Clark*, 668 F.3d 568, 573 (8th Cir. 2012).  The essential question is whether "a reasonable juror could have found the defendant guilty of the crime

60

charged beyond a reasonable doubt." *Foster*, 740 F.3d at 1205; *United States v. Reddest*, 512 F.3d 1067, 1069-70 (8th Cir. 2008).

## 2. ARGUMENT

Knight was not charged with directly making false statements; rather, he was charged with aiding and abetting Barber's false statements to the bankruptcy court:

> "From on or about July 31, 2009, through on or about November 9, 2010, in the Western District of Arkansas, Brandon Lynn Barber, aided and abetted by K. Vaughn Knight, did in this district and elsewhere, knowingly and fraudulently make a material false declaration, certificate and verification, under penalty of perjury, in and in relation to a case under Title 11 United States Code, namely, In re Brandon Lynn Barber, Debtor, No. 5:09-bk-73807, by submitting a Statement of Financial Affairs, in which the defendants fraudulently omitted up to or exceeding $1,000,000 in income belonging to Barber, for calendar year 2008 and instead reported income of $3,426.95 for calendar year 2008." (DCD 157 pgs 6-7).

61

It is significant that the "unlawful act" Knight is accused of aiding and abetting is Barber's sworn statement on the SOFA. This sworn statement was the only offense alleged in the indictment. Knight did not sign the SOFA, nor was he required to do so. Fed. R. Bankruptcy P. 1008, 9011. By definition Knight could not have committed this offense.

Because Knight was charged with "aiding and abetting" false statements, the Government was required to establish that Knight knew of the false statement and "committed an affirmative act to further" the false statement. *See United States v. Haye*s, 574 F.3d 460, 476 (8th Cir. 2009)(discussing aiding and abetting charges generally). Broken down into elements, this Court has required that the Government establish the following to convict on a charge of aiding and abetting: "(1) the defendant associated herself with the unlawful venture; (2) the defendant participated in it as something she wished to bring about; and (3) the defendant sought by her actions to make it succeed." *United States v. Mitchell*, 388 F.3d 1139, 1143-44 (8th Cir. 2004). In addition, the "most important element is the sharing of the criminal intent . . . ." *Snyder v. United States*, 448 F.2d 716, 718 (8th Cir. 1971). The evidence fails to establish these elements.

Knight's only connection to Barber's false statements was as his

Appellate Case: 14-2651     Page: 70     Date Filed: 01/21/2015 Entry ID: 4236142

attorney of record. Corroborated evidence established that Knight did not in any way assist or encourage Barber's false statements under oath. Knight testified that he instructed Barber "that he needed to disclose all of his income" and that it was better to "disclose more than not enough." (Tr. Day 8 pg 1450). Agent Kimbrough testified about a conversation between Barber and Knight:

Counsel "Q. [W]hat did [Brandon Barber] tell you that Mr. Knight had told him about reporting income on his bankruptcy proceeding?

Kimbrough A. Mr. Knight, according to the statements made by Brandon on that date, he said that Vaughn Knight told him to report everything.

Q. Did he tell you that he did report everything?

A. Barber said he did not report everything."

(Tr. Day 7 pg 953).

Knight in no way "associated" himself, participated in or sought to make the false statements successful. He instructed his client to make full disclosure on the bankruptcy petition.

The Government contends that Knight knew from personal involvement that Barber's income from various real estate transactions

63

was "exponentially" higher than the reported amount. This argument reveals a simplistic view of sophisticated business transactions. Gross proceeds of a business entity do not always equal profit or income for the individual. The Government views Barber's entity income as income that is automatically reportable on the SOFA as the income of the "Debtor," Brandon Barber. Even the Government's own expert stated that Knight had a reasonable legal basis for not including entity income on the SOFA. (DCD 208 pgs 75, 96-98, Tr. Day 9 pg 1672). Furthermore, Knight had not at any time given Barber tax advice. (Tr. Day 8 pg 1560). Knight was aware that Barber had a bookkeeper and an accountant. (Tr. Day 8 pg 1560). So, when Barber decided to file bankruptcy, Knight requested the income information from these individuals and relied upon the income figures they provided for the SOFA. (Tr. Day 8 pg 1560). This is consistent with the Rule of Bankruptcy Procedure 9011, particularly because Barber alone signed the petition confirming the accuracy of its contents.

The reality is that Barber lied to Knight countless times for more than two years, and the bankruptcy petition was yet another lie. (Tr. Day 8 pg 1533). While Knight was attempting to gather information for the bankruptcy trustee, Barber instructed his bookkeeper to hold back

64

information from Knight. (DX 96). Quite simply, Knight could not have "shared" Barber's criminal intent when Knight was attempting to provide accurate information, only to be deceived by Barber. Without this shared intent, there can be no "aiding and abetting" of any crime. *Snyder*, 448 F.2d at 718.

Finally, at the trial, two bankruptcy attorneys testified regarding an attorney's disclosure obligations on the bankruptcy petition, supporting schedules and the SOFA. Prior to the trial, each formed differing opinions and then changed their opinion on the stand after hearing the precise details of this case. The District Court observed that both highly qualified, experienced bankruptcy experts

> "could not agree as to what [disclosures] were required given the complex factual scenario of this case * * * the relevance and import of the bankruptcy disclosures as to whether Knight had the requisite criminal intent to conceal bankruptcy assets at the time of the transfers through his trust account were made is substantially lessened." (DCD 208 pg 75).

The District Court concluded that it was not reasonable for the jury to conclude that Knight was guilty of aiding and abetting Barber's false

Appellate Case: 14-2651    Page: 73    Date Filed: 01/21/2015 Entry ID: 4236142

statement on his SOFA and accordingly entered an acquittal. (DCD 208 pg 96). Even a *de novo* review of the evidence reveals insufficient evidence to convict Knight on this charge. The District Court found "no evidence * * * that Knight independently influenced" Barber's income calculations on the SOFA. (DCD 208 pg 93). Furthermore, Knight did not make any false statement on Barber's SOFA; rather he relied upon his client, his client's bookkeeper and the accounting professionals to provide the required income information for the SOFA. Being Barber's attorney and "mere association" with him is "not sufficient to establish [Knight's] guilt. *Snyder*, 448 F.2d at 718. Accordingly, the acquittal should be affirmed.

### III. THE CONDITIONAL NEW TRIAL ON COUNT 3: MAKING FALSE STATEMENTS WAS PROPER.

#### 1. STANDARD OF REVIEW

The grant of a new trial is reviewed for an abuse of discretion. This standard is discussed at length above.[15] In short, the District Court's grant of a conditional new trial on Count 3 should be affirmed unless there was an abuse of discretion or a clear error of judgment. *Huerta-Orozco,* 272 F.3d at 566.

---

[15] *See* pages 36-38.

66

## 2. ARGUMENT

The District Court was correct to grant a conditional new trial on Count 3: False Statements for three reasons. First, a conditional new trial is necessary because the evidence preponderates so heavily against the verdict that a miscarriage of justice may result. Second, the errors in the jury instructions would have warranted a new trial if the acquittal had not been entered. Finally, a new trial was necessary because the evidence itself preponderated against the guilty verdict.

As set forth above, the District Court entered an acquittal on this charge because the evidence was insufficient to establish that "Knight knew Barber was making a false statement as to his 2008 income on the SOFA and committed an affirmative act to further the offense." (DCD 208 pg 96). The Federal Rules of Criminal Procedure require that a court must at least consider whether a new trial is warranted should the judgment later be vacated or reversed. Fed. R. Crim. P. 29(d)(1), (3). After entering an acquittal verdict, the District Court found that a conditional new trial was warranted because

"the evidence as to the following elements is largely lacking:

(1) Knight's making an affirmative act in furtherance of Barber making the charged false statement; (2) the fact that

67

a false statement was made; and (3) Knight's intent to defraud, taking into consideration the good-faith defense." (DCD 208 pg 99).

Second, there were material errors in the jury instructions. Although Knight was charged with making false statements only as it related to Barber's 2008 income reported on the SOFA, the jury instruction was much broader and did not identify the specific false statement. (Tr. Instructions pgs 14-15). Further complicating the jury instruction, the definition of "intent to defraud" provided was also general. (*Id.*). There was no mention or reference to the SOFA and Barber's 2008 income. The District Court noted these errors in its Opinion and Order and observed that "in the context of this case" the instruction was "clearly erroneous" and would require a new trial. (DCD 208 pg 91). The Court further observed that the "instructions may have allowed the jury to convict Knight of aiding and abetting a false statement not specifically charged in the indictment." (DCD 208 pg 99).

Finally, and perhaps most significantly, the evidence preponderated against the guilty verdict. The District Court determined that a reasonable jury could not have found Knight guilty beyond a reasonable doubt. (DCD 208 pg 96); *United States v. Weaver*, 554 F.3d

68

718, 720 (8th Cir. 2009). Further, the Court found that Knight had a good-faith basis for any advice to Barber or omission from the SOFA because even experienced bankruptcy experts, with the benefit of hindsight and the luxury of time to review, could not determine what should properly have been disclosed. (DCD 208 pgs 97-98).

## IV. CONCLUSION

The grant of a new trial on the charges of conspiracy to commit bankruptcy fraud, bankruptcy fraud and money laundering was proper and well within the District Court's discretion. The Order should be affirmed and the case remanded for a new trial on Counts 1, 2 and 4-8.

The District Court correctly entered an acquittal on Count 3: Making False Statements. Because Knight was charged with aiding and abetting Barber and because Knight lacked the necessary criminal intent, this acquittal should be affirmed. In the alternative, this charge should be remanded for a new trial.

The District Court had legitimate concerns that the interests of justice had not been served. It is in the best interests of Knight, the Government and this Court that the District Court's order be affirmed.

Appellate Case: 14-2651    Page: 77    Date Filed: 01/21/2015 Entry ID: 4236142

Respectfully submitted:

K. Vaughn Knight, Appellee


By: /s/ *Sarah L. Waddoups*
     David R. Matthews
     Arkansas Bar No. 76072
     Kimberly R. Weber
     Arkansas Bar No. 94207
     Sarah L. Waddoups
     Arkansas Bar No. 2004103
     Matthews, Campbell, Rhoads,
     McClure & Thompson, P.A.
     119 South 2nd Street
     Rogers, AR 72756
     (479) 636-0875 / fax (479) 636-8150

Appellate Case: 14-2651   Page: 78   Date Filed: 01/21/2015 Entry ID: 4236142

# CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel of record certifies that the foregoing Appellee's Brief for Appellee K. Vaughn Knight complies with the type-volume limitations set forth in Rule 32(a)(7)(B).

This brief was prepared using Microsoft Word 2010 and is printed in 14-point Times New Roman typeface, a proportionately spaced, serif font. This brief contains 13,020 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B).

Further, in accordance with The Eighth Circuit Court of Appeals' Local Rule 28A, the undersigned counsel of record certifies that Appellee's Brief and the Appellee's Supplemental Appendix have been scanned for computer viruses and are believed to be virus free.

/s/ *Sarah L. Waddoups*
Sarah L. Waddoups
Attorney for Appellee, K. Vaughn Knight
January 20, 2015

71

Appellate Case: 14-2651    Page: 79    Date Filed: 01/21/2015 Entry ID: 4236142

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2015, I electronically filed the foregoing Appellee's Brief and Supplemental Appendix with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF System.  I certify that I electronically served the following:

| Connor Eldridge U.S. Attorney, Western Dist. Arkansas | Leslie R. Caldwell Assistant Attorney General, Arkansas | Sung-Hee Suh Deputy Assistant Attorney General | Stephan E. Oestreicher, Jr. Attorney, U.S. Dept of Justice |
|---|---|---|---|

Upon approval of the digital filing and in compliance with Local Rule 28A, Appellee shall serve paper copies of this Appellee's Brief and Supplmental Appendix each counsel listed above.

*/s/   Sarah   L.   Waddoups*
Sarah L. Waddoups

72